James A. GREEN, Plaintiff,

v.

**ST. PAUL MERCURY INSURANCE CO., Defendant.**

No. 70–1599–Civ.–JE.

United States District Court,
S. D. Florida.

May 19, 1972.

Harry Zuckerman of Ehrich & Zuckerman, Miami, Fla., for plaintiff.

Eugene L. Heinrich, of McCune, Hiaasen, Crum, Ferris & Gardner, Ft. Lauderdale, Fla., for defendant.

## OPINION

LAYTON,[*] District Judge.

This diversity suit presents a declaratory judgment action in which the plaintiff seeks to recover benefits arising out of an insurance policy. The plaintiff, a citizen of Florida, was the president of Marine Exploration Company (hereinafter referred to as Marine), a Florida corporation whose business activities included the renovation and construction of pier facilities. The defendant, St. Paul Mercury Insurance Company (here-inafter referred to as St. Paul), issued an insurance policy to Marine through its agent, the American Foreign Insurance Association (hereinafter referred to as AFIA).

AFIA acts as a "clearing house" for insurance agencies and brokerage firms with clients having need for insurance coverage for foreign operations. It issues the requested coverage in the name of one of the member domestic insurance companies which it selects.

Marsh & McLennon, Inc. (hereinafter referred to as Marsh), is an incorporated insurance agency and brokerage firm with offices in Miami, Florida. Mr. Arthur A. Pendleton is its authorized agent. Marsh was the insurance agent for Marine, selected to procure and handle its necessary insurance coverage.

In 1969, Marine contracted with a branch of the Haitian government to construct, repair or extend pier facilities extending into the harbor at Port-au-Prince, Haiti.[1] The requirements and specifications of this construction contract were prepared by the J. G. White Engineering Corporation (hereinafter referred to as White), the project engineers for the government of Haiti. Marine undertook to procure insurance through Marsh which would include injury, medical and disability insurance to cover United States national employees of Marine who would undertake the performance of the pier work.

Marsh contacted Mr. J. Berry Wallace, the regional manager of AFIA, in Washington, D. C., who, after having seen the White requirements and specifications, issued the policies and assigned coverage to St. Paul.

The construction work on the pier commenced on December 14, 1969. Marine's operations were supervised by Mr. Timothy Watkins, an officer of Marine, subject to the approval of Mr. Leveque,

---

[*] Sitting in the United States District Court for the Southern District of Florida by assignment.

1. An 880 foot extension to the old dock. Incidentally, this appears to have been the only pier within Port-au-Prince or its immediate environs except for a Texaco Oil dock which is in no way involved in this case.

an official of the Haitian government. Due to certain problems with the progress of the work, and the personal situation of Watkins, whose wife was unhappy in Haiti, the plaintiff, in the normal course of his duties as president, flew to Haiti on January 13, 1970.

At a meeting with Leveque, on January 14th, the plaintiff discussed the Port-au-Prince situation and the possibility of Marine obtaining further work in Haiti. One of these projects was the renovation of a dock at a flour mill, about 30 miles from the pier in Port-au-Prince. This flour mill pier renovation had been discussed by Marine and Haiti on other occasions. Leveque said he would talk further with plaintiff next day, January 15th. Plaintiff was returning next day to Miami so that apparently his return flight was not until afternoon.

Plaintiff's version of the case is this. Plaintiff did not know the location of the flour mill. After working through the day of January 14th overhauling a turbo charger and moving Watkins' furniture, plaintiff arranged with his foreman, Leroy, to guide him to the mill. About 10:00 P.M., they mounted two motorcycles for the expressed purpose of visiting the flour mill dock. Leroy led plaintiff to the New Orleans Cabaret, intending to socialize with other employees of Marine usually present at the bar. Plaintiff did not drink any alcoholic beverages, and after a short time, Leroy and plaintiff left the bar to go out to the flour mill pier. Upon nearing the motorcycles, the men were confronted with a group of "street urchins," who importuned them for rides on the cycles. Rodrique Plantin, a barman at the New Orleans Cabaret, was given a ride on plaintiff's motorcycle. Plaintiff and Plantin travelled down the road about a mile to the Royal Cabaret, another bar often frequented by Marine employees, turned around, and failed to see the New Orleans Bar on the return trip due to an electrical blackout, a frequent occurrence in Port-au-Prince. About a quarter mile past the bar, plaintiff swerved his cycle to avoid running into oncoming traffic. He ran off the road into a mound of dirt, suffering the very serious injuries for which he seeks to recover.

Plantin in his deposition stated that the ride was at the request of the plaintiff who asked him, for reasons unexplained, to point out the location of the Royal Cabaret. According to plaintiff's version, the group of noisy, importuning Haitians, including Plantin, were visibly arousing Leroy's anger to the point where plaintiff feared Leroy might do something rash and cause an incident detrimental to the presence of Marine in Haiti; therefore, he offered to give Plantin a ride. It is not at all clear why the plaintiff's fears about Leroy's actions would be erased by offering Plantin a ride when there were so many Haitians clamoring for a ride also. At any rate, since the Royal Cabaret is in the opposite direction from the flour mill dock, the sole relationship between the ride and the inspection trip can only be the "public relations" issue.

Plaintiff contends that any accident occurring in the course of the proposed trip to the flour mill site to make an inspection of the flour mill dock pier was covered by the St. Paul policy.

Defendant counters by arguing that the ill-conceived plan to inspect this pier late at night was not incident to the plaintiff's employment and was not within the coverage of the contract.

The insurance contract issued by defendant provided that benefits arising out of the policy would be determined as if the Marine employees were covered by the provisions of the Longshoremen's and Harbor Workers' Act. The contract purported to cover:

"All operations of the named insured's U. S. National Employees involving construction, addition, and renovation of existing piers, at Port-au-Prince, Haiti." (Emphasis added.)

The employees covered were:

" * * * those employees of the insured who are hired or assigned by

him to work at locations within the country or countries stated * * *. The insurance * * * shall attach from the moment he is assigned for such work and shall cease from the moment his employment or assignment for such work is terminated."

Clearly, plaintiff was an employee covered by the policy. The crucial question becomes, however, whether the contract should be construed so that the incident causing the accident is an "operation" involving work on "piers at Port-au-Prince."

Plaintiff and defendant agree that defendant had notice only of the White contract to be performed at Port-au-Prince prior to issuing the policy. Plaintiff argues that since the insurer knew that Marine had only one contract for one pier, but issued a policy covering all operations on existing piers, defendant must be held liable for the injury occurring while plaintiff was allegedly engaged in a preliminary "operation" on the flour mill dock renovation.

■ First, the use of the words "all operations" is not in itself particularly significant. Even if a single pier were to be constructed, the process of construction might entail several operations. Second, although this point was not brought out at trial, the deposition of Pendleton shows that he believed the words "pier" and "piers" were interchangeable and related solely to the White contract.[2] However, the defendant had a copy of the White contract, and because it was responsible for the wording of the insurance contract, the misinformation possibly provided by Pendleton cannot enable the defendant

to escape whatever liabilities it may have under the contract as written.

■ Even so, the flour mill dock was located miles outside the boundaries of Port-au-Prince, Haiti. Under these circumstances, the language of the policy specifically excludes coverage for such operations because they would not be performed "at Port-au-Prince, Haiti."

Plaintiff does not contend that St. Paul could not geographically limit the effective scope of its insurance coverage. He does argue, however, that the policy itself named the entire country of Haiti as the usual workplace of the insured from which operations covered by the policy were conducted. While this may be so, as already noted, the more specific delineation of the actual work to be performed stated "piers at Port-au-Prince, Haiti." In fact, the policy states under "Locations," *all usual workplaces of the insured.* (Emphasis added.) In view of the fact that "piers at Port-au-Prince" was the sole workplace pursuant to the provisions of the White contract, and the White contract being the only existing contract, it cannot seriously be contended that the failure to write specifically "piers at Port-au-Prince" under that particular contract sub-heading makes St. Paul liable for this accident, since, as far as defendant was aware and in fact, the "usual workplace" was "piers at Port-au-Prince."

■ Plaintiff also argues that since St. Paul ultimately extended the very same policy to cover the plaintiff's company work on the flour mill dock in June of 1970, it must have geographically extended coverage to the flour mill dock in

2. Pendleton deposition, 5–6:
A: October 20, 1969. I am reading from notes made at the premises of Marine Exploration Company. At that time they advised me that they were negotiating a contract with the Port Authority of Port-au-Prince to construct certain piers and reinforce certain existing wharfs for the Government of Haiti.
Page 9:
A: [The job] was done under a contract by a White Engineering firm * * *.

Q: Did you know whether there was any additional work contemplated by Marine Exploration?
A: Not at that time, but they were hoping the Haitian government would * * * provide them with some interim work.
See also, 44–45, 56–59.

January 1970, prior to the accident. This again is a non sequitur. Concededly, several months later, upon being advised of the entering into of a contract for the flour mill dock, the defendant thereafter voluntarily extended the same policy without revising the language because the wording could cover such an interpretation. But the mere fact that language could be interpreted to represent a specific changed business situation in no way infers that such interpretation was in fact made prior to the arising of that particular business situation.

■ I conclude, then, that the proper interpretation of the insurance contract is that defendant is bound by its rather obvious error in the use of the word "piers" to the extent that had there been any other piers in Port-au-Prince upon which work was reasonably contemplated but no contract for work had been signed, then the defendant under proper circumstances would have been liable despite the existence of the White contract indicating that work on the one pier only was intended. But the fact remains that no such other pier existed and no agreement for work on the flour mill pier was made until months later. It necessarily follows that the inspection trip to the flour mill pier 30 miles outside of Port-au-Prince was not within the scope of the insurance coverage contemplated by this contract.

■ But even adopting plaintiff's theory of the case, I cannot find that his injuries were recoverable despite the liberal interpretation given to the Longshoremen's and Harbor Workers' Act by the Courts. Assuming both (1) plaintiff's construction of the contract (2) that his plan to visit the flour mill pier as related were true[3] and that the injury was incurred on the way to, at the flour mill pier, or on the way back, I must conclude that the condition of employment did not create the "zone of danger" rationale contemplated by such authorities as O'Keefe v. Smith Associates, 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965); Gondeck v. Pan American Airways, 382 U.S. 25, 86 S.Ct. 153, 15 L.Ed.2d 21 (1965) and O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951).[4] Aside from *Brown-Pacific-Maxon*, where an employee of a defense contractor in a recreational area, regarded as within a business environment, deliberately dove into a dangerous channel to rescue a drowning person, I find no case where a person, who himself created the dangerous situation, can recover for injuries thus sustained. In this case, aside from the departure from the plan to give a joyride to a young Haitian for alleged public relations reasons, we have a sudden decision late at night to take a trip by motorcycle over a road with many potholes, probably heavily traveled, and

3. Were it necessary to accept plaintiff's version of the proposed trip to the flour mill pier, this Court would have strong reservations as to whether it met the test of credibility. Why did plaintiff defer such an important matter as inspecting the pier the entire day of January 14 and up until 10:00 P.M. that night? Why did he prolong his already late departure to visit this bar? Why did he further prolong the start by giving a joy ride to Plantin alone in light of the fact that there were many other Haitians clamoring for a ride? How could Leroy, who in all probability had never visted this pier, be an acceptable guide and, in any event, find the side road late at night which provided access to the flour mill? Why did they not affirmatively testify they had provided themselves with strong torches in view of the likelihood the pier might be unlighted? Why could not plaintiff's return have been postponed a day or two?

4. O'Keefe v. Smith Associates, supra, civilian employee at defense base in Korea drowned in boating accident at recreational area. Held, entitled to recover. Gondeck v. Pan American Airways, supra, civilian employee of contractor at defense based killed in jeep accident returning from recreational area. Held, entitled to recover. O'Leary v. Brown-Pacific-Maxon, supra. Compare, Van Devander v. Heller Electric Co., 132 U.S.App.D.C. 40, 405 F.2d 1108. (D.C.Cir. 1970).

finding an unlighted turn to make an inspection of a pier which might have no illumination, thus necessitating an inspection by flashlight, and where neither Leroy or plaintiff testified they had provided themselves with flashlights against such a contingency.

In my view, this curiously conceived trip further complicated by the decision to give Plantin a joy ride, created a zone of danger not incident to the regular business concept for which defendant did not contract to insure. This Court holds that the facts as developed by this case present an instance:

> " * * * where an employee [has gone] so far from his employment and become so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment."[5]

Therefore, plaintiff cannot recover in the instant case.

Present order.

---

5. *Brown-Pacific-Maxon*, 340 U.S. 507, 71 S.Ct. 472.